714 A.2d 381 (1998)
314 N.J. Super. 233
In the Matter of the ADMISSIBILITY OF MOTOR VEHICLE SPEED READINGS PRODUCED BY the LTI MARKSMAN 20-20 LASER SPEED DETECTION SYSTEM.
Superior Court of New Jersey, Law Division, (Criminal), Morris County.
Decided March 20, 1998.
*382 Michael M. Rubbinaccio, Butler, for the State.
Steven K. Greene, Joseph T. Maccarone and Sohail Mohammed, appeared as Amici Curiae.
STANTON, A.J.S.C.

BACKGROUND
This supplementary proceeding involves the reliability of a device known as the LTI Marksman 20-20 Laser Speed Detection System manufactured by Laser Technology, Inc. For ease of expression, I shall hereafter usually refer to this device as the "laser speed detector" or the "detector." The laser speed detector is a compact, hand-held device which the New Jersey State Police desire to use in enforcing the laws regulating motor vehicle speeds.
In 1996, in connection with a number of motor vehicle speeding cases which were then pending in the municipal courts of Rockaway Township and Parsippany-Troy Hills Township, I conducted an extensive evidentiary hearing in the Superior Court for Morris County on the admissibility of speed readings obtained by the New Jersey State Police through use of the laser speed detector. In that earlier proceeding, Michael M. Rubbinaccio, Esq., who was then serving as the Municipal Prosecutor for both Rockaway Township and Parsippany-Troy Hills Township appeared for the State. Stephen K. Greene, Esq., Joseph T. Maccarone, Esq. and Sohail Mohammed, Esq. appeared as attorneys for various defendants in the motor vehicle cases then pending in the municipal court.
On June 13, 1996, I issued a written opinion in that matter which concluded that the general concept of using lasers to measure speed is widely accepted in the relevant scientific community and is valid. However, I was not satisfied that it had been proven that the laser speed detector device was accurate and reliable enough to be used for law enforcement purposes. My principal reason for not accepting the laser speed detector was that there had not been, in my view, adequate *383 operational testing of the laser speed detector under actual highway conditions. My view was that good performance testing might conceivably put us in a position of being sure that the detector in fact worked reliably.
I suggested that it would be relatively easy to design performance tests which would let independent observers know how accurate the laser detector device was. I suggested that the tests should include vehicles of varying sizes and shapes, that they be conducted under various conditions of traffic flow along actual highways and roads, and that they be conducted at different times of day under varying climatic conditions. I noted that such tests should involve target vehicles whose speed was reliably established either by controlling the driver of the vehicle or through simultaneous measurement of its speed by a reliable device other than the laser speed detector. I further noted that the test data would have to be accurately recorded and reproduced for examination, analysis and replication by other persons and agencies.
The State did not take an appeal from my decision excluding evidence generated by the laser speed detector. The various cases then pending in the municipal courts were resolved without the use of laser speed detector evidence. However, the State did attempt to conduct performance testing of the detector in an effort to develop data which would permit a reexamination of the admissibility of speed readings produced by the detector. Accordingly, the New Jersey Department of Transportation, Bureau of Transportation Data Development, in cooperation with the New Jersey State Police, Division of Highway Traffic Safety, conducted field testing of the laser speed detector during September, October and November of 1996 and June and July of 1997. Closed track testing of the detector was conducted on September 19, 1996.
In 1997, the State moved to have me reopen the evidentiary proceedings involving the laser speed detector. By that time, the pending motor vehicle cases had been resolved and there were no defendants who had an interest in contesting the admissibility of readings from the detector. However, in view of the fact that the State Police were interested in using the detector and were prepared to attempt to justify the admissibility of readings produced by the detector on the basis of the field testing which had occurred, it seemed to me that it would be desirable for any proceeding to take place in this court in a way which would allow the parties to build upon evidence which had been presented during the 1996 hearings before me. Although I thought it useful and in the public interest to try to build on the earlier proceedings, I did not want to have a non-adversarial proceeding before me because such a proceeding would not be likely to produce an appropriately vigorous scrutiny of the data presented.
Fortunately, Mr. Greene, Mr. Maccarone and Mr. Mohammed, attorneys who had represented defendants in the earlier proceedings, remained interested in the issues involved and they agreed to appear as amici curiae and to present evidence and argument designed to subject any data presented by the State to meaningful scrutiny. Although Mr. Greene, Mr. Maccarone and Mr. Mohammed consented to act as friends of the court on an uncompensated basis, I did enter an order on July 8, 1997, requiring the State to cover the reimbursement of defense expert fees and costs. In this way, we were able to make it possible to evaluate the test data generated by the State on an adversarial basis.
I refer to the Opinion which I issued on June 13, 1996 for a detailed description of the laser speed detector and of the operational and conceptual objections which were raised in opposition to its acceptance. I incorporate herein by reference everything which I said in that earlier opinion without repeating it in detail. However, I do think it useful to repeat at this point a general description of the way in which the laser speed detector is supposed to work:
A laser is an artificially generated and amplified light which is in the infrared light section of the electromagnetic wave spectrum. It is not visible to the naked eye. It is very concentrated. The laser speed detector fires a series of laser pulses *384 at a selected remote target. When the laser light strikes the target, a portion of the light is reflected back to the detector. Since the speed of light is a known constant, by measuring the time it takes for the laser pulse to travel to the target and back, the detector is able to calculate the distance between the detector and the target. Each laser pulse which is fired and reflected back establishes one distance reading. The laser speed detector fires 43 laser pulses every time the trigger on the detector is squeezed. These 43 pulses are fired in a total period of approximately one-third of a second. If the target at which the laser pulses are fired is a stationary target, each of the 43 pulses will give the same distance reading to the target, and distance will be the only thing that the detector can tell us about the target. However, if the target is moving, each of the 43 pulses will give a slightly different distance reading and the detector can then compute the velocity or speed of the target from the changes in distance divided by the known elapsed time between the firing of each of the laser pulses. In simplest terms, this is the basic theory underlying the use of lasers to calculate speed, and there can be no dispute about its fundamental validity.

THE STANDARD
In February, 1995, the National Highway Traffic Safety Administration of the United States Department of Transportation issued Model Minimum Performance Specifications for Lidar Speed Measurement Devices. The laser speed detector is a lidar device. The specifications require that the speed measurements produced by the device shall not exceed true speed by more than one mile per hour or underreport speed by more than two miles per hour. True speed is a somewhat philosophical concept, since any measuring device is susceptible to some amount of error. For practical purposes, the inquiry into whether a particular device meets the standard specified has to be determined by comparing the device in question to other devices whose reliability is generally accepted. Since we are dealing in speed law enforcement cases with efforts to convict motorists of speeding violations, the more significant aspect of the standard is that we do not want a device to over-report speed by more than one mile per hour.

CLOSED TRACK TESTING
Closed track testing of the laser speed detector was conducted at Raceway Park in Englishtown on September 19, 1996. Four standard passenger automobiles supplied by the State Police were driven on the track on controlled speed ranges varying from 90 miles to 20 miles per hour. The vehicles were clocked simultaneously by the track timer, by K-55 radar, by a device known as the PEEK 241 recorder and by the laser speed detector. The track timer used was a Compulink System III which used infrared detectors designed to calculate miles per hour over a 66-foot speed trap. It is certified by various international automobile racing organizations. K-55 radar is widely used by police departments throughout New Jersey for law enforcement purposes and has been accepted as reliable by New Jersey courts for more than 18 years. The PEEK 241 recorder is a portable traffic monitoring device which is used in New Jersey and in many other states by state highway departments to determine traffic volumes and speeds. It is not used for law enforcement purposes against individual motorists. It determines vehicle speed by calculating the time required for a vehicle to activate two road hoses placed a known distance apart.
In the closed track testing at Raceway Park, the laser speed detector was activated approximately 50% of the time against approaching vehicles and approximately 50% of the time against vehicles which were pulling away from the operator of the detector. The laser speed detector and the track timer measured vehicles simultaneously on 114 occasions. The speed reading produced by the laser speed detector exceeded that produced by the track timer by more than one mile per hour in only one case. The reading in question was two miles per hour higher than the track timer. The laser speed detector and the PEEK 241 measured the same vehicles simultaneously on 234 occasions. The measurements produced by the laser speed detector *385 never exceeded the measurements produced by the PEEK 241 recorder by more than one mile per hour. The laser speed detector and the K-55 radar measured vehicles simultaneously on 210 occasions. The measurements produced by the laser speed detector never exceeded the measurements produced by the radar by more than one mile per hour. The laser speed detector showed a slight bias towards underreporting speed when compared with each of the other measuring devices.

HIGHWAY TESTINGRADAR
On October 1, 1996, State Police officers deployed K-55 radar and the laser speed device on Interstate 80 in Mount Olive Township, Morris County. The officers deploying the devices were appropriately trained and certified and took positions on either the shoulder or the median of the highway which would be used in standard law enforcement operations. The radar and the laser speed detector were used simultaneously against 300 vehicles which happened to be traveling along the highway at varying speeds and at varying distances. The measurements produced by the laser speed detector exceeded the measurements produced by the K-55 radar by more than one mile per hour on one occasion. On that occasion, the laser reading was two miles per hour higher than the radar reading.
On November 6, 1996, K-55 radar and the laser speed device were again used simultaneously by appropriately trained State Police officers on Interstate 80 in Mount Olive Township. The officers again took up standard law enforcement positions and deployed the devices against 599 vehicles traveling along the highway at varying speeds and ranges. Most of the vehicles measured simply happened to be traveling along the highway. However, a marked State Police car with a calibrated fifth wheel speed measuring device was operated along the highway on 51 occasions during that test. The measurements produced by the laser speed device exceeded the measurements produced by the radar by more than one mile per hour on one occasion. In that instance, the laser speed detector showed a reading five miles per hour higher than the measurement produced by the radar. On the 51 occasions on which the laser measured the speed of the State Police vehicle equipped with the fifth wheel, the laser speed detector never exceeded the measurement produced by the fifth wheel.
In the highway testing against radar, the laser speed detector showed a slight bias towards underreporting speed. The laser speed detector also showed a slight (but more pervasive) bias towards underreporting as compared to the fifth wheel.
If we combine the closed track testing results and the highway testing results for a comparison of K-55 radar and the laser speed detector, we have 1,109 cases in which radar and the laser speed detector measured the speed of vehicles simultaneously. In only two cases did the speed measurement produced by the laser speed detector exceed the measurement produced by radar by more than one mile per hour.
The closed track testing took place during daylight hours in fair weather. The highway testing of the laser speed detector as compared to radar also took place in daylight hours during fair weather. As previously noted, during the closed track testing, the laser speed device was deployed against approaching vehicles approximately one-half of the time and against vehicles pulling away approximately one-half of the time. In the highway testing, the laser speed detector was deployed against approaching vehicles on 599 occasions and against vehicles pulling away on 300 occasions. Very few measurements were taken at ranges of more than 1,000 feet.

HIGHWAY TESTINGWIM SYSTEM
On a number of days in September and October of 1996, the laser speed detector was tested against piezoelectric Weigh-In-Motion (WIM) systems which were owned and operated by the New Jersey Department of Transportation. These systems are manufactured by International Road Dynamics, Inc. and are used by the Department of Transportation in connection with federally mandated systems to monitor the weight of trucks. In addition to recording vehicle weight, the systems also record vehicle speeds. The WIM systems employ various *386 sensors imbedded in the highway pavement and are not apparent to a motorist. In the WIM systems used in New Jersey, the sensor array usually consists of one upstream loop followed by two downstream piezoelectric cable sensors. The upstream loop alerts the system to the entry of a vehicle. The downstream sensors measure vehicle speed by determining the time it takes for a vehicle to pass between the two sensors. Since the distance between the sensors is a known quantity, vehicle speed can be readily calculated by the electronic package attached to the system. The WIM systems used in the test were calibrated against K-55 radar. The laser speed detector was positioned at a fixed distance from the WIM system for each testing session. The fixed distance was changed from session to session and varied from 500 feet at the closest range to 1,000 feet at the longest range. The laser speed detector system was operated by a trained State Police officer who positioned himself either on the median or the shoulder of the highway in a position comparable to that which he would assume in normal law enforcement operations. The laser speed detector was deployed against vehicles happening to pass along the highway at the same time at which they passed through the WIM system.
The WIM system was deployed in only one lane at a time, and the lane was varied from testing session to testing session. The laser speed detector was compared against the WIM system on Interstate 80 in Knowlton Township, Warren County and on Interstate 95 in Ewing Township, Mercer County.
The speeds of a total of 799 vehicles were calculated simultaneously by the WIM system and the laser speed detector. Test results were not affected by whether the vehicles being measured were in the slow lane, the center lane or the fast lane of the highway. Three hundred forty-five vehicles were measured in daylight during fair weather. In five cases the speed measurement produced by the laser speed detector exceeded the measurement produced by the WIM system by more than one mile per hour. In each of those five cases, the laser speed detector reading was two miles per hour higher. The speeds of 304 vehicles were measured simultaneously at night time in fair weather. In no case where readings were taken after dark did the measurement produced by the laser speed detector exceed the measurement produced by the WIM system by more than one mile per hour.
The WIM system and the laser speed detector were simultaneously used against 150 vehicles during daytime when moderately heavy rain was falling. In nine cases, the speed measurement produced by the laser speed detector exceeded the measurement produced by the WIM system by more than one mile per hour. In six of those nine cases, the laser speed detector reading was two miles per hour higher. In three of those nine cases, the laser speed detector reading was three miles per hour higher.
As stated above, a total of 799 vehicles were measured simultaneously by the WIM system and the laser speed detector. In 14 cases out of this total group, the measurement produced by the laser speed detector exceeded the measurement produced by the WIM system by more than one mile per hour. The figure for readings in excess of one mile per hour is markedly higher for the WIM system comparison than for the comparison between the laser speed detector and radar. Despite that, even with respect to the WIM system, the laser speed detector showed a bias towards underreporting of speed. Indeed, even with respect to measurements taken in the rain (where there were nine readings which were more than one mile per hour higher on the laser speed detector), there was a very slight bias on average in the direction of underreporting of speed.
I note that the highway testing of the laser speed detector in comparison both to the WIM system and to K-55 radar involved a complicated mix of motor vehicles which happened to be driving along the highway sections where tests were being conducted. There were all sorts of passenger motor vehicles, vans, sports utility vehicles, and many types of trucks. Speed readings were not affected by the type of vehicle whose speed was being measured.

*387 GENERAL RESULTS OF SPEED MEASUREMENTS

Taking an overview of the data on speed measurements, as compared to radar, the laser speed detector produced an identical reading a little more than 65% of the time, a non-identical reading within the range of -2 miles per hour to +1 mile per hour a little more than 34% of the time, and a reading outside the range of -2 miles per hour to +1 mile per hour a little less than ½ of 1% of the time. Thus, the readings were within the range required by the Model Minimum Performance Specifications of the National Highway Safety Administration 99.5% of the time. As compared to the WIM system, the laser speed detector produced an identical reading a little more than 40% of the time, a non-identical reading in the range of -2 miles per hour to +1 mile per hour a little more than 56% of the time, and a reading outside the range of -2 miles per hour to +1 mile per hour a little more than 3% of the time. Thus, the readings were within the range required by the Model Minimum Performance Specifications approximately 96.5% of the time.

......
There were no tests conducted in cold winter weather. However, the way in which the laser speed detector functions and the characteristics of its component parts are such that I am satisfied that winter temperatures within the range expected in New Jersey would not affect the functioning of the detector. If temperature did affect the functioning of the detector, the result would be a failure to get a reading, not an erroneous reading.
There was no testing of the laser speed detector under conditions of heavy rainfall or under conditions when snow was falling. My expectation is that heavy rain might interfere with the transmission of laser pulses and might make it impossible to obtain speed measurements. I suspect it is even more likely that falling snow would block the obtaining of measurements by a laser speed detector. However, the absence of testing in conditions of heavy rain or of snow is not of practical significance. Heavy rain and snowfall do cause safety problems on our highways, but those problems do not arise because motorists operating under those conditions travel at speeds in excess of posted limits. The reality is that heavy rain and snowfall would typically cause motorists to travel at speeds well below posted limits and law enforcement officers would not have any occasion to deploy a laser speed detector in conditions of heavy rain or of snow.

ERROR TRAPPING
In the earlier Opinion with respect to the laser speed detector which I issued on June 13, 1996, I discussed some of the erroneous data which could theoretically be produced if laser pulses were allowed to sweep along a vehicle, or were panned from one vehicle to another or were to splash from one vehicle to another. The designer of the laser speed detector is aware of those possibilities for error, and has designed computer programs and hardware mechanisms calculated to trap a variety of errors. When the laser speed detector receives data which do not permit an accurate calculation of speed, it is designed to give an error message. An error message is not an erroneous reading. It is a positive statement by the detector that it cannot make a speed measurement because it is receiving insufficient data or inconsistent data.
In preparation for the current hearings, the State conducted a number of field tests designed to determine whether the error trapping programs and mechanisms were functioning appropriately. On September 26, 1996, the State Police deployed the detector against 25 different vehicles which happened to be traveling along Interstate 80 in Knowlton Township. The police officer operating the detector targeted a vehicle traveling abreast of another vehicle and then panned the detector from the target vehicle to the adjacent vehicle. Panning was accomplished in some instances by vertical movement of the target designator dot off the target vehicle, in some instances by horizontal movement of the dot off the target vehicle and in still other instances by circular movement of the target dot. This kind of operation should have produced error messages. In each of *388 the 25 cases in which there was deliberate panning from one vehicle to another, the laser speed detector gave an error message indicating that it could not make a speed calculation because of insufficient or inconsistent data.
On June 30 and July 1, 1997, additional tests of the laser speed detector's error trapping abilities were carried out by the State Police and the Department of Transportation on Interstate 80 in Mount Olive Township. In the first test, the operator targeted one of two vehicles moving abreast of another vehicle and moved the target dot horizontally from one vehicle onto the other while keeping the trigger depressed. Fifty vehicle pairs were targeted in this manner. This kind of use should have produced error messages. In each instance, an error message was produced. The 50 vehicle pairs used for this test were a variety of motor vehicles which happened to be traveling along the highway while the procedures were being performed.
In a further test, two State Police cars were driven at controlled speeds in adjacent lanes. The target vehicle in the left lane was instructed to maintain a speed of 55 miles per hour, while the target vehicle in the center lane was instructed to maintain a speed of 53 miles per hour. The target dot was then panned horizontally from the faster vehicle in the left lane to the slower vehicle in the center lane. Eight total passes were made at ranges varying from 1,000 feet to 400 feet with several readings being taken on each pass. This kind of use should have produced error messages. A total of 57 readings were obtained. Each of the 57 readings was an error message.
In a further test, two State Police vehicles were driven in adjacent lanes, with the left lane vehicle being instructed to maintain a speed of 55 miles per hour, while the central lane vehicle was instructed to maintain a speed of 53 miles per hour. In this test, the operator of the detector was instructed not to target either vehicle, but instead to target a spot between the two vehicles. Eight total passes were made, and 53 readings were obtained. This kind of use should have produced error messages. Each of the 53 readings was an error message.
The next procedure was designed to determine the ability to detect a different kind of error possibility. Theoretically, an accurate speed reading might be determined from a variety of points on a vehicle. However, the best point on a vehicle for obtaining a speed reading is the license plate, and police officers are instructed to target the license plate when attempting to get a reading for law enforcement purposes. An accurate speed measurement might be obtained on occasion by targeting the windshield of a vehicle, but the configuration and texture of windshields are such that poor and misleading reflections would normally be returned from the windshield area. In this test, the detector operator was instructed first to fire a distinct laser shot at the license plate and then to fire a second distinct shot at the windshield of the vehicle. Fifty target vehicles were randomly selected from vehicles traveling along the highway. A speed reading was received for each of the 50 vehicles with respect to the laser shot fired at the license plate, but the results were markedly different for the shots fired at the windshields. In 44 cases, the shot fired at the windshield produced an error reading, which would be the usual expectation. In six cases, the shot fired at the windshield produced a speed measurement. In five of those six cases, the windshield speed reading was exactly the same as the license plate speed reading for the same vehicle. In one of the six cases, the windshield target speed was one mile per hour higher than the license plate target speed.
This test was repeated with a slight variation on 50 additional randomly selected vehicles. The variation for the second set of 50 vehicles was that the grill area of the vehicle would be targeted first, with a second shot being taken at the windshield of the vehicle. The grill area of the vehicle is thought to be almost as good a spot for getting an accurate reading as is the license plate. In this variation of the test, a speed reading was obtained from each of the 50 vehicles when the grill area was targeted. With respect to the shots fired at the windshield area, 48 error messages were received. Two speed measurements *389 were obtained from the windshield area, and each of them was identical with the speed measurement obtained from the license plate area of the same vehicle.
A further test of error trapping involved 50 vehicles, most of which were trucks, with several being vehicles such as a bus or a motor home. In each case, the laser speed detector operator was instructed to pan the detector's red target dot along the side of the vehicle while keeping the trigger depressed. This kind of operation should have produced error messages. For all 50 vehicles, the laser speed detector produced an error message. In the next error trapping test, 49 trucks and one motor home were randomly selected from the traffic flow, and the laser speed detector operator was instructed to pan on the side of the vehicle in both a horizontal and a vertical direction. For each of the 50 vehicles, an error message was obtained.
A further test involved two State Police vehicles traveling in tandem in the left lane. The lead car was instructed to maintain a steady speed of 55 miles per hour, while the trail car was instructed to maintain a following distance of three car lengths behind the lead car. The laser speed detector operator was instructed to target the lead car and then move the red target dot between the lead and the trail cars while keeping the trigger depressed. The vehicles were targeted starting at 1,000 feet and as many readings as possible continued until the lead car reached the 400 foot range. This kind of operation should have produced error messages. A total of six passes were made and 50 distinct readings were produced by the detector. Each reading was an error message.

VEHICLE DISCRIMINATION
In another test, trucks were randomly selected from the traffic flow. A State Police vehicle was then instructed to drive alongside the truck and to achieve a maximum speed of 65 miles per hour as it passed the truck. The laser speed detector operator was instructed to target the police vehicle first while it was alongside the truck and then to take as many distinct measurements as possible of the police vehicle until the police vehicle was within 400 feet of the operator. At that point, a final speed measurement was to be taken by a separate shot fired at the truck. The purpose of this test was to determine whether reliable speed measurements could be obtained on vehicles in a passing situation and to determine whether any "splashover" of the laser beam occurs in this sort of passing situation. A claimed advantage of the laser speed detector over radar is that it can discriminate between vehicles under these conditions and get an accurate speed measurement of each vehicle. A total of 11 passes and 61 measurements were made. In each case, an accurate speed measurement was obtained for each vehicle targeted and no "splashover" occurred.
The final test involved two State Police vehicles traveling in tandem. The lead car was instructed to maintain a steady speed of 55 miles per hour, while the following car was instructed to maintain a steady speed of 53 miles per hour. The laser speed detector operator was instructed to target the lead car and to lock the target dot on the lead car. He was then to take as many readings as possible of the lead car while the tandem pair approached the operator. The lead vehicle was targeted at 1,000 feet and as many readings as possible were continued until the lead car reached the 400 foot range. At that point, the operator was instructed to fire a separate distinct shot at the trail vehicle. A claimed advantage of the laser speed detector over radar is that it can discriminate between vehicles under these conditions and get an accurate speed measurement of each vehicle. Eight passes were made in this fashion and a total of 52 readings were made. In every instance, the detector obtained a valid speed measurement on both the lead and the trail vehicles.

......
The various tests conducted by the State Police which were designed to explore the error trapping capability of the laser speed detector indicated that the error trapping programs and mechanisms functioned precisely as the detector manufacturer claimed they would. Other tests indicated that when *390 operated carefully, the laser speed detector had the ability to discriminate between vehicles which the manufacturer claimed. However, the friends of the court presented a videotape of a procedure which produced a result which seemed to indicate that the error trapping mechanisms did not always work as they were supposed to. In the procedure presented on the videotape, the laser speed detector was targeted at a stationary vehicle and at the side of a house and was then moved with the trigger depressed in a variety of directions. In a number of instances, this procedure produced on the laser speed detector a speed measurement indicating that the stationary object or the stationary vehicle was moving at a slow rate of speed, such as five miles per hour or eleven miles per hour.
The designer of the laser speed detector, Jeremy Dunne, countered this testimony by saying that the error trapping programs built into the detector were designed to cope with insufficient or inconsistent data which would be produced by an operator using the detector for its intended purpose. That is to say, they were designed in contemplation of being used against moving vehicles and of coping with error risks which might be produced when the laser beam was targeted on such vehicles or close to them. As I understood this testimony, presumably an error trapping program could be designed to prevent a speed reading of a stationary vehicle, but the manufacturer had not gone to the trouble and expense of designing such a program, because, in real life, an operator using the detector for law enforcement purposes would have no reason to target a stationary vehicle and then to move the detector around while keeping the trigger depressed. In short, the detector was not designed to be deployed against a stationary vehicle or object (except for distant measurement purposes), and there simply was no need to design error trapping programs with respect to speed measurements from a stationary vehicle or object. I accept this explanation.

COMMENTS ON THE TESTING PROGRAM
Evidence with respect to performance testing of the laser speed detector was presented to me in a hearing which extended over a period of four days. The evidence established that the basic testing observations were made and recorded by State Police officers and by employees of the Department of Transportation. I am satisfied that the observers honestly and accurately made and recorded their observations. The basic data was then compiled and organized by Stephen R. Decker, a principal engineer employed by the New Jersey Department of Transportation. Except for some insignificant clerical errors, the compilation and reporting of the a sic data are fundamentally accurate.
The testing program designed and carried out by the Department of Transportation and the State Police was far from perfect. As the friends of the court pointed out, the testing could have been much more comprehensive with respect to the number of vehicles and with respect to variations in climate conditions. Better procedures for cross-checking and verification of data collection could have been employed. There were anomalies which were not explored as fully as they might have been.
For example, although the vast bulk of speed measurements fell within the acceptable range of -2 miles per hour to +1 mile per hour, there were a number of readings which were markedly outside that range and there was no explanation proffered with respect to that. There was one laser speed detector reading which was as much as seven miles per hour below the reading produced by the device against which it was being compared, and there was another laser speed detector reading which was as much as five miles per hour higher than the reading produced on the device against which the detector was being compared. Even though those anomalous readings were very limited in number, I would have preferred to have received some plausible explanation for them other than being asked to conclude that they are harmless anomalies.
I note that 150 measurements taken in conditions of moderate rainfall produced nine laser speed detector readings which were more than one mile per hour higher than the readings produced by the comparison device, *391 while 1,758 measurements taken in fair weather produced only seven readings which were more than one mile per hour in excess of the reading produced by the comparison device. It is possible that the rainfall may have been affecting the comparison device more than the laser speed detector, but that was not explored. It is also true that the highest reading produced by the laser speed detector in rainfall conditions was only three miles per hour in excess of the reading produced by the comparison device, and three miles per hour is not, in my judgment, a disqualifying number in terms of the practical law enforcement situation in which the detector will be used. But there is a somewhat troubling divergence from the viewpoint of scientific inquiry.

CONCLUSION
I end up being impressed by the fact that when we combine the results for the comparisons with both the WIM system and radar, we have only 16 cases out of 1,908 in which the speed measurement produced by the laser speed detector exceeded the measurement produced by the comparison device by more than one mile per hour. That amounts to 0.8%. I also note that the speed measurement produced by the laser speed detector only once exceeded by more than one mile per hour the measurement produced by the track timer and never exceeded by more than one mile per hour the measurement produced by the PEEK 241 or the fifth wheel.
I am satisfied from the evidence presented in the proceedings which led to the issuance of my Opinion of June 13, 1996 and from the evidence presented during the recent hearings before me that the general concept of using lasers to calculate the speed of motor vehicles is generally accepted within the relevant scientific community and is valid. Despite the fact that the testing conducted was far from perfect, it was adequate, and I am satisfied from the totality of the evidence presented to me that the laser speed detector produces reasonably uniform and reasonably reliable measurements of the speed of motor vehicles under conditions likely to be present on New Jersey highways when the detector is used for law enforcement purposes. The error trapping programs and mechanisms built into the detector are fully adequate to prevent unreliable speed measurements when used for law enforcement purposes. Accordingly, under the broad teaching of cases such as Romano v. Kimmelman, 96 N.J. 66, 474 A.2d 1 (1984), and State v. Wojtkowiak, 170 N.J.Super. 44, 405 A.2d 477 (Law Div.1979), reversed on other grounds, 174 N.J.Super. 460, 416 A.2d 975 (App.Div. 1980), speed readings produced by the laser speed detector should be received as evidence of the speed of motor vehicles without the need for expert testimony in individual prosecutions arising under the motor vehicle laws.

......

ORDER
For the reasons expressed in the foregoing Opinion, speed readings produced by the LTI Marksman 20-20 Laser Speed Detection System manufactured by Laser Technology, Inc. (hereinafter "laser speed detector") shall be admitted into evidence in all municipal courts in Morris County and in Sussex County in the prosecution of any case arising under the motor vehicle laws. Admissibility of such readings shall be subject to the rules set forth below:
1. Expert testimony in support of admissibility shall not be required, except as specifically set forth below.
2. Appropriate training of the law enforcement officer operating the laser speed detector shall be shown in each case.
3. Pre-operational checking procedures recommended by the manufacturer of the laser speed detector shall be shown to have been made in each case.
4. Speed measurements shall be admitted whether made in daylight or at night and within any temperature range likely to be found in New Jersey, even if made under conditions of light or moderately heavy rainfall, but speed measurements taken during heavy rain or while snow is falling shall not be admitted *392 without the support of adequate expert testimony in the individual case.
5. Speed measurements made at any distance up to 1,000 feet shall be admitted, but measurements made at any distance in excess of 1,000 feet shall be admitted only with the support of adequate expert testimony in the individual case.