418 So.2d 583 (1982)
STATE of Louisiana
v.
Jeff L. SPENCE.
No. 81-KA-2398.
Supreme Court of Louisiana.
June 21, 1982.
Rehearing Denied September 3, 1982.
*585 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Kay Kirkpatrick, Premila Chumbley, Asst. Dist. Attys., for plaintiff-appellee.
Sam J. D'Amico, D'Amico & Curet, Baton Rouge, for defendant-appellant.
LEMMON, Justice.[*]
This is an appeal from a conviction on two counts of negligent homicide.[1] The principal assignments of error concern radar readings of automobile speed and the testing of the alcohol content of defendant's blood.[2]
Facts
While patrolling an interstate highway, State Trooper Jones observed a sports car break out from a pack of approaching cars in the opposite lane. His radar system clocked the speed of the vehicle at 76 miles per hour. The trooper turned across the neutral ground and pursued the speeding vehicle.
As they approached an exit, the pursued vehicle slowed down and moved to the right in order to take the exit ramp. When the trooper turned on his red signal lights in an attempt to pull the vehicle over, the driver accelerated to a speed of approximately 80 mph. The trooper also accelerated at first, but then slowed when he realized that the pursued vehicle would have difficulty entering *586 the heavy traffic on the boulevard at the exit. The vehicle continued at a high rate of speed through the yield sign at the boulevard. Unable to make the sharp turn, the driver attempted to brake and skidded through the northbound lane of the boulevard, hit the raised median, and literally flew into another vehicle. The impact killed two of the passengers in the other car.
Defendant, the driver of the sports car, was a 19-year-old student at Southeastern Louisiana University at the time of the accident. Before leaving Hammond to drive to Baton Rouge, defendant had drunk a quantity of "jungle juice". His blood alcohol content was measured at 0.06% two hours after the accident.
Assignment of Error No. 2
Defendant contends that the trial court erred in denying his motion to suppress the intoximeter test. Specifically, he alleges since the advice of rights form contained the outdated provision that "refusal to submit to this chemical test may also result in the loss of your vehicle registration and license plates", his consent to submit to the test was improperly coerced, and the test results should have been excluded from evidence.[3]
Although the form used in this case had not been updated to comport with the amended statute, the form correctly advised defendant that his license would be suspended if he refused (R.S. 32:667) and that his refusal would be used against him in court (R.S. 32:666). Moreover, his constitutional rights were fully explained to him. Under these circumstances, the allegedly inaccurate advice of possible additional consequences was not sufficient to require suppression of the test results.
Defendant also points out that the advice of rights form contained the notation, "if you refuse the test until you can talk to a lawyer, you will still lose your license". He argues that placement of this clause immediately after the listing of constitutional rights gives the arrested person the impression that he has no such rights, as well as coercing him into submitting to the test.
The clause cannot reasonably be interpreted as implying that an arrested person does not have a constitutional right to consult a lawyer. It merely informs a person that he cannot delay taking the test until he has consulted a lawyer, without incurring the risk that he will lose his license.
The reason for this rule is obvious. The relevant point in time for measuring blood-alcohol content is immediately after the driver is stopped, because the blood-alcohol percentage decreases with the passage of time. Were the result otherwise, the driver could effectively defeat the state's efforts to conduct a prompt test by requesting that *587 he be given the opportunity to consult a lawyer.
Finally, defendant contends that he could not make a knowing and intelligent decision on submitting to the test because the form did not advise him of the consequences of submission, namely, that the results of the test could be used as evidence against him.
R.S. 32:661(C) does not require such a warning, but only requires that defendant be advised of the consequences of a refusal to submit. The right against self-incrimination is not implicated in the gathering of physical evidence, such as a blood sample for scientific testing, and a warning that such evidence can be used in court is not constitutionally required. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).
This assignment of error lacks merit.
Assignment of Error No. 4
Defendant contends that the trial court erred in admitting radar evidence of the speed of defendant's vehicle without a proper foundation. C.Cr.P. Art. 773. He further submits that the trial court erroneously took judicial notice of the reliability of radar evidence. Defendant argues that in order to permit the introduction of the results of radar devices, it is necessary first to lay a proper foundation by expert testimony as to the accuracy of the particular type of instrument used by the officer.
On direct examination, Trooper Jones was asked to describe the type of radar equipment in his vehicle. Defense counsel was overruled when he objected to the introduction of any evidence concerning the radar equipment without the proper foundation.
The trooper then proceeded to explain in detail how his equipment worked, showing a vast and comprehensive knowledge of the system. He testified that he was qualified by the Federal Communications Commission to operate a radar system, that he was also certified by Kustom Systems, the manufacturer of this particular unit that had been selected and furnished for his use by the Office of State Police, and that he was even responsible for training other state troopers in the use and operation of the radar unit. He further testified that he tested the system by means of tuning forks prior to each shift of duty and that on this particular evening he calibrated and tested his unit, which was in perfect working order.
When the state then asked Jones the speed of defendant's vehicle as shown on his radar device, defense counsel objected to the admissibility of such evidence. The trial court retired the jury and allowed defense counsel to question the witness on the foundation for admissibility of the evidence. After extensive cross-examination, the trial judge interrupted when defense counsel asked the witness a hypothetical question concerning the functioning of the radar device in a situation involving approaching vehicles, noting that the witness could not testify about hypothetical situations without being qualified as an expert.
The jury was brought back in, and the state continued to lay a foundation. Defense counsel objected again when the witness was asked the speed of the vehicle, and the objection was overruled.
The scientific reliability of radar as a recorder of speed is a proper subject for judicial notice.[4] See Annotation, Proof, By Radar or Other Mechanical or Electronic Devices, of Violation of Speed Regulations, 47 A.L.R.3d 822 (1973) and the cases cited therein. The accuracy of radar equipment as a method of measuring speed is so widely known and commonly accepted that it is unnecessary to call an expert witness in each case to testify as to this fact. Defense counsel in the present case conceded as much, but attacked the accuracy and reliability of the particular instrument used in this case.
*588 The accuracy of a particular radar unit can be established by showing that the operator tested the device in accordance with accepted procedures to determine that the unit was functioning properly and that the operator was qualified by training and experience to operate the unit.
The use of calibrated tuning forks, furnished by the manufacturer with each unit, is an accepted method of testing to determine that the set is operating properly and measuring accurately. Before he went on duty each day, Trooper Jones tested the set for accuracy with the tuning forks. He testified that on the day of this incident he tested the unit and determined that it was functioning properly.
As to the qualifications of the operator, Trooper Jones testified in detail as to his vast training and experience. Additionally, he was certified to operate the radar equipment by the manufacturer and by the Federal Communications Commission, as noted earlier.
The trial judge properly required the state, upon objection by defense counsel, to lay a foundation for the admissibility of the measurement by radar of defendant's speed, and correctly concluded that an adequate foundation had been established. Accordingly, there is no merit to the assignment complaining of the admission of the radar evidence.
Assignment of Error No. 5
Defendant contends that the trial court erred in denying his motion for a mistrial when the trooper testified that defendant had resisted arrest. Specifically, defendant argues that such testimony amounted to a legal conclusion or opinion by the witness in violation of R.S. 15:463, which limits testimony to facts known by the witness.
On direct examination, the officer described what he saw and did while at the scene, as follows:
"I stopped by Mr. Spence's vehicle again. And, I placed handcuffs on his wrists and one around the steering column because I was not able to watch him continually and he was sitting in the car. He was in a dazed condition. I didn't notice any cuts or lacerations on his face. So I justso he would not leave the scene because thatwhat had happened here he had been resisting by flight when ."
Defense counsel objected and moved for an admonition and a mistrial, arguing that the officer had given a legal opinion that defendant's actions constituted the offense of resisting an officer. The trooper's statement, in context, was merely an explanation of his decision to handcuff defendant to keep him from leaving the accident, because defendant had previously tried to evade pursuit. The jury could hardly have viewed the testimony as expressing the officer's opinion of defendant's guilt of an uncharged crime.
Defendant also contends that the trooper's statement was an impermissible reference to another crime in violation of C.Cr.P. Art. 770. Defendant's conduct described by the officer was part of the res gestae, which is always admissible. R.S. 15:447 and 448.
Accordingly, the trial court properly denied defendant's motion for a mistrial.
Assignment of Error No. 10
Defendant contends that the trial court erred in allowing Trooper Jones to testify on redirect examination that alcohol contributed to the accident. Defendant contends that such testimony was in violation of R.S. 15:463, which provides that a witness can testify only as to facts within his knowledge and may not give an impression or opinion.
During cross-examination, Trooper Jones was asked whether he would have arrested defendant for DWI, had he been an investigating officer and not merely a witness to the collision. Trooper Jones answered affirmatively. When defense counsel attempted to impeach him with a statement he had made during the preliminary hearing, Trooper Jones explained the discrepancy in his statements. Defense counsel's questioning continued as follows:

*589 "Q. Officer the fact remains that you were an officer on the scene. You had chased this man and youuhknew good and well that what you should have done if you drive while intoxicated to have charged him with DWI, isn't that true?
"A. No, sir, it was a city police investigation, sir. I was simply a witness.
"Q. Suppose you had stopped him and you went up to him and he smelled of alcohol without the accident, wouldn't youwould you or would you not have charged him with a DWI?
"A. As I stated at a preliminary examination, no, I would not have."
Defense counsel apparently was not merely questioning the officer about defendant's intoxication for impeachment purposes, but for the purpose of getting the officer to admit that defendant did not appear intoxicated at the time of the accident.[5] Under such circumstances, it was entirely proper for the state on redirect examination to elicit further testimony on the trooper's perception of defendant's alcohol related behavior. Furthermore, even if the specific question calling for an opinion was improper, the officer's answer could hardly be grounds for reversal of the conviction.
Assignment of Error No. 13
Defendant contends that the trial court erred by not allowing him to question Officer John Barker concerning the authenticity and reliability of the auto-intoximeter tests.
Officer Barker of the Baton Rouge City Police testified for the state as to his training and experience in operating the auto-intoximeter machine. The court informed defendant that he would be entitled to cross-examine the witness as to the foundation for the administering of this particular test before the witness would be allowed to answer any question concerning the reading on the machine when defendant was tested. At one point in the cross-examination, defendant asked the witness whether he had a certificate from the manufacturer as to the intoximeter's authenticity. The state objected, stating that the witness had not been offered as an expert in the history of the machine, but merely as the police officer who conducted the alcohol testing. The court sustained the objection and reminded defense counsel to limit his examination to foundation-related questions and to questions concerning compliance with the regulations of the Department of Public Safety.
Defendant correctly argues that the question of the certification of the machine's reliability was a proper subject of inquiry on cross-examination. However, a certified inspector of these machines, Lawrence Efferson, had testified earlier regarding the recertification of the machine, and the current recertification form was introduced into evidence. Officer Barker simply testified as to his operation of the machine, and he presented the proof of his certification to operate the machine.
We conclude there was no error in the trial court's refusal to allow defense counsel to question this particular witness on the certification of the machine.
Assignment of Error No. 20
Defendant contends that the trial court erred by not instructing the jury to disregard the results of the auto-intoximeter test, because there was no expert testimony on the interpretation of the machine's reading presented by the state. Specifically, defendant argues that it was reversible error to allow the jury to consider the fact that defendant had a 0.06% blood-alcohol level.
Officer Barker, who administered the breath test to defendant, testified that the results of the test indicated that defendant had a blood-alcohol content of 0.06 grams percent.[6] When the witness was asked what a 0.06% reading meant in terms of "grams percent", defense counsel objected, stating that the witness was only qualified *590 to testify as to the machine reading and not to interpret the results. The court sustained the objection. Defense counsel then requested that the court instruct the jury to disregard the test results. The court denied this request, and defendant now argues that it was reversible error for the jury to consider the fact that defendant had a 0.06% blood-alcohol level.
The essence of defendant's contention is that the test results should not have been admitted, unless the state produced expert testimony to interpret them.
The present case is distinguishable from State v. Williams, 375 So.2d 931 (La.1979).[7] In this case, the state did not use the presumption that a person with 0.10% or more is under the influence of alcoholic beverages, because defendant's blood-alcohol level was nowhere near the 0.10% legal presumption level.
The trial judge did not instruct the jury that a finding of 0.10% gave rise to a presumption that the person was under the influence of alcoholic beverages, as occurred in State v. Williams, above. The jury was simply informed that defendant had alcohol in his blood, a fact which could properly be considered with other competent evidence in determining whether defendant was under the influence of alcohol. Moreover, the trial judge did not instruct the jury by reading the arguably unconstitutional presumption in the second paragraph of R.S. 14:32. Rather, he properly informed the jury that "[i]f you find that a person violated a safety law and thereby injured another, you may but are not required to infer that he was criminally negligent". Under these circumstances, there was no prejudice to defendant in admitting the test results without expert testimony interpreting the results.
The convictions and sentences are affirmed.
DIXON, C. J., concurs with reasons.
*591 DIXON, Chief Justice (concurring).
I respectfully concur. The results of the blood-alcohol test should not have been admitted, because of the ambiguous, erroneous and unconstitutional threat of the consequences of seeking legal advice. The suppression of the test results, however, would probably not have affected the verdict.
NOTES
[*] Judges William Norris, III and Fred C. Sexton, Jr. of the Second Circuit Court of Appeal and Robert L. Lobrano of the Fourth Circuit Court of Appeal participated in this decision as justices pro tempore with Chief Justice Dixon and Associate Justices Marcus, Blanche and Lemmon.
[1] Defendant was sentenced to three years on each count, to run concurrently. The sentences were suspended, and defendant was placed on three years of supervised probation with the following conditions: (1) his driving privileges were suspended for one year; (2) he was required to make restitution to the victims' families in the amount of $50 per month for three years; (3) he was required to do volunteer work for eight hours per week in an authorized medical treatment facility preferably in the emergency room; and (4) he was required to remain in pursuit of his college education.
[2] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix which is attached to this opinion and is a part of the official record.
[3] R.S. 32:661 outlines the procedures that must be followed before the results of a chemical test may be used at trial. Section 661(C) provides:

"C. When a law enforcement officer requests that a person submit to a chemical test as provided for above, he shall first inform the person of the consequences of a refusal. In addition, the law enforcement officer shall have the person sign a standard form advising such person of his constitutional rights; the law enforcement officer shall have the person sign a separate form advising such person of the consequences of his refusal to submit to a chemical test, provided however that a single combination of the two forms may be used. If the person is unable or unwilling to sign the form, the law enforcement officer shall certify that such person was informed of his constitutional rights and was unable or unwilling to sign said form. If the above procedure is not complied with, the results of the test or any reference to it is inadmissible into evidence in any criminal action or proceeding arising out of acts alleged to have been committed while the person was driving or in actual control of a motor vehicle upon the public highways of this state while under the influence of alcoholic beverages."
R.S. 32:896 formerly provided that the registration shall be suspended for all motor vehicles registered in the name of a person refusing to submit to the test, unless that person has or provides proof of financial responsibility with respect to all motor vehicles registered by him. That statute has been amended, but still provides that if a person refuses to submit to the test, the suspended license shall not be reinstated or reissued unless that person provides proof of financial responsibility with respect to all motor vehicles registered by him.
[4] The trial judge in this case stated, outside the presence of the jury, that he was taking judicial notice of the reliability of radar.
[5] Intoxication, with its attendant behaviorial manifestations, is an observable condition about which a witness may testify. State v. Neal, 321 So.2d 497 (La.1975).
[6] R.S. 32:662 provides:

"A. The chemical test or tests as provided for by this Part shall be subject to the following rules and shall be administered as provided for hereafter:
"1. Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of alcoholic beverages the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of the person's blood, urine, breath or other bodily substance shall give rise to the following presumptions:
"a. If there was at that time 0.05 per cent or less by weight of alcohol in the person's blood, it shall be presumed that the person was not under the influence of alcoholic beverages.
"b. If there was at that time in excess of 0.05 per cent but less than 0.10 per cent by weight of alcohol in the person's blood, such fact shall not give rise to any presumption that the person was or was not under the influence of alcoholic beverages, but such fact may be considered with other competent evidence in determining whether the person was under the influence of alcoholic beverages.
"c. If there was at that time 0.10 per cent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages.
"B. Percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood.
"C. The foregoing provisions of this section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether the person was under influence of alcoholic beverages.
"This section has no application to a civil action or proceeding."
[7] In State v. Williams, above, this court held that the legal presumption of intoxication arising from a finding of 0.10% or more of alcohol in a person's blood could not be used in a negligent homicide case, because that presumption, combined with the presumption in R.S. 14:32 that violation of a statute is presumptive evidence of criminal negligence, improperly shifts the burden of proof to defendant.

The court noted, however, that blood-alcohol test results may be admissible, although the combined presumptions are not. The court stated:
"Nor do we hold that the PEI test result itself is necessarily inadmissible, if otherwise proper under the rules of evidence, including (assuming indeed it is admissible under evidence law) the requirement of a proper foundation of the reliability of the test and the use of sworn expert opinion testimony to evaluate its results, subject to cross-examination." Id. at 936.
Thus, the state was not improperly relieved by a combination of statutory presumptions of its burden of proving beyond a reasonable doubt the essential elements of criminal negligence.