216 P.3d 1227

**STATE of Hawai'i, Respondent–
Plaintiff–Appellee**

v.

**Abiye ASSAYE, Petitioner–
Defendant–Appellant.**

No. 29078.

Supreme Court of Hawai'i.

Sept. 30, 2009.

Summer M.M. Kupau, (James S. Tabe, on the briefs), Deputy Public Defenders, for petitioner-defendant-appellant.

Brian R. Vincent, Deputy Prosecuting Attorney, for respondent-plaintiff-appellee.

MOON, C.J., NAKAYAMA, and DUFFY, JJ., Circuit Judge MARKS, in Place of RECKTENWALD, J., Recused, and ACOBA, J., Concurring Separately.

Opinion of the Court by NAKAYAMA, J.

Petitioner–Defendant–Appellant, Abiye Assaye ("Assaye"), has applied for a writ of certiorari from the Intermediate Court of Appeals' ("ICA") January 13, 2009 summary disposition order affirming the District Court of the First Circuit's ("trial court's") [1] judgment convicting Assaye of the offense of excessive speeding, in violation of Hawai'i Revised Statutes (HRS) § 291C–105(a)(1) and/or (a)(2) (Supp.2006).[2] In his application for writ of certiorari before this court, Assaye asserts that the ICA gravely erred (1) "in concluding that [Respondent–Plaintiff–Appellee, State of Hawai'i ('prosecution'),] laid the requisite foundation for the admissibility of the laser gun reading pursuant to *State v. Stoa*, 112 Hawai'i 260, 265, 145 P.3d 803, 808 (App.2006)," and (2) "by failing to recognize that the [prosecution] did not lay the requisite foundation for admissibility of the laser gun reading as required by *State v. Wallace*, 80 Hawai'i 382, 910 P.2d 695 (1996), and *State v. Manewa*, 115 Hawai'i 343, 167 P.3d 336 (2007)." For the following reasons, we reverse the trial court's February 27, 2008 judgment because the ICA's decision is obviously inconsistent with both this court's decision in *Manewa* and its own decision in *State v. Ito*, 90 Hawai'i 225, 978 P.2d 191 (App.1999).

## I. BACKGROUND

### A. Factual Background

On February 27, 2008, the prosecution orally charged Assaye with committing the offense of excessive speeding on September 5, 2007, in violation of HRS § 291C–105(a)(1) and/or (a)(2).

At a bench trial held on the same day, Honolulu Police Officer Jeremy Franks ("Officer Franks") testified that he was assigned "to the night enforcement detail solo bike, motorcycle unit," and in the evening of September 5, 2007, to "speed enforcement on the H–1 Freeway eastbound by the Radford pedestrian overpass." He testified further that he was equipped with and certified to use a "laser LTI 2020 Ultralight" ("laser gun"), and in the evening of September 5, 2007, used it on a vehicle that was traveling toward his stationary location on the freeway at a rate of speed that he observed to be "faster than the speed of traffic." Officer Franks testified that he aimed his laser gun at the front of this vehicle and his "laser" gave him "a reading of ninety miles per hour." Officer Franks testified that the posted speed limit for the stretch of freeway that he was monitoring that evening was fifty-five miles per hour. Officer Franks testified that he then proceeded to conduct a "traffic stop" to issue a citation to the driver of the vehicle, and identified Assaye as the person to whom the citation was issued.

At trial, Officer Franks testified, as follows, with regard to the proper functioning of his laser gun:

Q. Were you equipped with any type of device to measure the speed of vehicles that day?

A. Yes.

Q. What kind of a device was it?

A. The laser LTI 2020 Ultralight.

Q. Okay. Are you certified to use the LTI 2020?

A. Yes.

Q. Who were you certified by?

---

1. The Honorable Christopher P. McKenzie presided.

2. HRS § 291C–105 mandates, in pertinent part:
   (a) No person shall drive a motor vehicle at a speed exceeding:
   (1) The applicable state or county speed limit by thirty miles per hour or more; or
   (2) Eighty miles per hour or more irrespective of the applicable state or county speed limit.

A. My instructor was Sgt. Ryan Nishibun.

Q. Okay. And was the certification valid on September 5, 2007?

A. Yes.

Q. And were you instructed in the testing and operating of the device?

A. Yes.

Q. How many hours of instructions did you receive?

A. Four.

Q. Okay. On that day, . . . did you test your ultralight 2020 laser gun?

A. Yes, prior to my shift.

Q. Okay. And how did you test the gun?

A. I conduct four tests at the police main station. The first test is the self-test. You turn the laser on and the LEDs light up on the screen when you press the trigger. The next test is the display test. You scroll through the test mode button on the laser and it lights up all the LEDs on the screen saying that the display is working properly.

The next test is the scope alignment test. Also scrolled on the laser with the test button. The TT on the screen lights up and you look through the scope and there's a red dot in the middle of the scope and you press the trigger and wave it over a horizontal and vertical stationary object, and the tone of the laser when you press the trigger changes when you cross over the horizontal and vertical stationary object letting you know that the laser is centered, the scope is centered.

Then the final test is the delta distance test. That's used by two measuring tool[s], pre-measured points. First point, distance is a hundred and thirty feet. You scroll through the test mode button on the laser and it says D–1, or distance one, you shoot the furthest distance first. It comes out to one-thirty. Then you hit the select button and it goes to D–2, or distance two, and you shoot the closest distance to you which is one–0–five and the difference between that times two equals fifty, and if it's forty-nine, fifty or fifty-one, then the laser is calibrated and ready to go.

. . . .

Q. And did you do all those tests that day?

A. Yes.

Q. And what was the results of those tests?

A. It was functional and working properly. No errors, messages or anything like that on the—it was functional.

[DEFENSE COUNSEL:] And your Honor, object as to lack of foundation and—

. . . .

. . . Your Honor, the testimony that under *Maneva*, this is not sufficient to show that the laser was properly calibrated and working correctly that day. In the *Maneva* case, the situation was a scale, it was an electronic scale that the person, the expert testifying in that case had been trained to use, had used for twenty years.

. . . .

The supreme court said that in *Manewa* that that evidence should have been suppressed, or—well, that evidence should not have been admitted given that the, that witness could not actually lay the proper foundation that that particular device was properly calibrated and working correctly that day. Given all that, and as in that case, the scale was an essential element because that was about the weight of amount of drugs.

In this case, the actual reading of a laser device is an essential element cause if he's, if it falls below a certain number, above a certain number, the defendant is either guilty or not guilty. Beyond that, your Honor, I would like to voir dire him as to his qualifications.

. . . .

THE COURT: Well, I'm going to, if that's a motion to strike his testimony or an objection to the testimony, I'm gonna deny the motion, but will allow you to cross-examine the officer, and I just state for the record that I see a big difference between a scale ... weighing narcotics....

. . . .

... and a laser, whether a laser is working properly. The technology has been approved by our appellate court.

. . . .

[DEFENSE COUNSEL:] ... Can I have a running objection so I don't have to keep standing up....

THE COURT: To what?

[DEFENSE COUNSEL:] Any reading from the laser, any of his testimony that the laser was working correctly and was accurate that day, and I would basically want any of that, just constant running foundation—

THE COURT: Just a running objection to that.

. . . .

... So ordered....

Q. How many times have you checked the laser like this before?

A. Everyday before I work. I work five days a week, so the last year and a half, I never had any problems with the laser. I never had to turn it in for maintenance or something was wrong with it, the internal components.... If it wasn't working properly, I wouldn't have took it out on my shift and I would have turned it into one of the instructors....

The only maintenance that I do on it is clean the screen when it gets smudgy and change the batteries when they get weak. Other than that, I test the laser prior to my shifts and between after every citation issued, and after every citation issued, I test the scope alignment and that's about it that I was instructed to do by the instruc-

tors. That's all I have to know that it's operating.

. . . .

But on that day, it was working properly, no problems, and like I said before, I haven't had any problems since I've been assigned to the motorcycle detail over the year and three months that I've been shooting the laser, never had a problem with it.

Q. Just for clarification, before you issued the citation, did you check it?

A. Yes, fine, no problems.

(Brackets and ellipses added.)

With regard to the "scope alignment test," Officer Franks testified on cross-examination, as follows:

Q. (indiscernible) scope alignment test?

A. Sure.

Q. How far away is the stationary object that you (indiscernible)?

A. Could be anywhere from fifty to a thousand feet. A light pole or—

Q. When you did the test on that day, how far away was the stationary (indiscernible)?

A. As far as the delta distance test, hundred thirty feet.

Q. So, in fact, you just waved it over the delta distance pole?

A. Yeah.

. . . .

Q. So, when you do your scope calibration, you're kind of just eye-balling it. You look through the scope and you're looking at your pole a hundred thirty feet away and got your red dot centered on the pole and you wiggle it back and forth and you can hear a tone when it hits the pole, right?

A. At the edge, the edge, yeah.

Q. So, is it a tone when it's off or a tone when it's on?

A. It's both. Tone when it's on and the pitch changes when you scan it over.

Q. Okay (indiscernible).

. . . .

A. It's a little higher pitch knowing that you hit that mark.

Q. So, you believe that at least on that day that the scope was probably aligned based on (indiscernible) a hundred thirty feet away, it would tell you when it was actually hitting the object and when it wasn't hitting the object?

A. Yes.

(Ellipses added.)

With regard to the "self-test," Officer Franks testified on cross-examination, as follows:

Q. Let's talk about the test button?

. . . .

... The one that you just turn it on basically and the lights come on, right?

A. Right, you press the trigger and the screen lights up. The self-test.

Q. And you were trained that the self-test, the gun checks itself?

A. Correct. It will go through a series of checks. I'm not sure how it does it.

Q. You understand there's some kind of internal software, something that does that?

A. Yes, some circuitry, yes.

Q. Okay. But you haven't been certified by the manufacturer of the gun as someone who could program that software?

A. No.

Q. Or open up the gun and work on it?

A. No, never have, probably never will.

. . . .

Q. . . . . But you have no idea how that software works and how that self-test works?

A. No idea.

Q. If the self-test is not working correctly, if it should be saying no, no, no, I don't work instead of yes, yes, yes because the program itself is wrong, you wouldn't know that, right?

A. If something went wrong, if I press the trigger and the self-test, if there's a error message that comes up on the screen E–50, 55 or whatever error message that comes up on the screen, I wouldn't know how it got that, but right at that point, the laser would be not in working order, so I would turn it in.

Q. But we're assuming that the self-test, that program is working correctly and actually catching the errors, the other errors?

A. Correct.

Q. Okay. But you don't know and you haven't been trained to know when the self-test doesn't work right and is giving you false responses, false positive responses, correct?

A. Right.

(Ellipses added.)

With regard to the "delta distance test," Officer Franks testified on cross-examination, as follows:

Q. . . . . As far as the delta distance test?

A. Yes.

Q. Those two poles that you shoot, those two poles don't move?

A. Don't move.

Q. Okay, those are stationary poles?

A. Stationary poles.

Q. And so, when you shoot those, ... do you know exactly how it works, do you have a sense of it shoots out laser beams and they respond to a laser eye?

A. Yes.

Q. And it gives you a distance reading?

A. Correct.

Q. Okay. So, that gun can tell you for certain that a hundred-thirty-yard pole is a

hundred thirty feet away, a hundred-thir-ty-feet-away pole?

A. Yes, cause I pre-measured the distances myself, so it just confirms that the distance I pre-measured is a hundred and thirty feet.

Q. But it doesn't tell you that the pole is moving because the pole is still, right?

A. Correct.

Q. Okay. Although, when you do the test, it divides by two and tells you fifty miles per hour?

A. Correct.

Q. Okay. So, as part of your test, you actually shoot two still poles and get a reading of fifty miles per hour?

A. One-thirty, one-O-five and then the internal mechanism circuitry calculates how it calculates and comes out with plus or minus one.

Q. On that day ... that you pulled over the defendant, had you done any test where you actually shot a moving object and got a reading that you know, that is a moving object that you knew the exact speed of and got the correct reading on that?

A. No.

. . . .

... That's not what I was trained to do.

(Ellipses added.) At the conclusion of cross-examination, Assaye moved "to suppress any reading from the LTI 2020 pursuant to *Manewa* (indiscernable)." The trial court orally denied his motion.

The trial court orally concluded, in pertinent part:

[W]ith respect to the big issue that you've both been arguing, and that is, whether the ... LTI 2002 [sic] was operating or whether it was calculated properly, I'm finding that if you read *Stoa*, which accepts the technology and accepts it as a reliable laser technology, you read that together with the officer's testimony con-

cerning the four tests, and that the gun, and I'm finding that in this case the laser gun was operating properly at the time and place, that it was used with respect to [Assaye's] alleged offense.

I'm also finding that in this case, and the [prosecution] proved beyond a reasonable doubt ... that Officer Franks was certified in the use of the laser. He had taken class. He had classroom training and obviously on the job experience with it. He performed the four tests that he had been instructed to perform. All those indicated to the officer the gun was working properly and the Court finds that the gun, the LTI–2020 was working properly.

The Court finds that the officer knew how to use it properly and did, in fact, use it properly, that he had a continuance view of ... your vehicle, Mr. Assaye, from the moment he put the red dot on the front of your vehicle, that he got a readout of ninety miles per hour in a fifty-five-mile-an-hour zone at four hundred and ninety-two feet. . . .

(Ellipses and brackets added.)

On February 27, 2008, the trial court filed its judgment of conviction and sentenced Assaye to pay a fine of $650, several fees totaling $137, and to perform thirty-six hours of community service work. Additionally, the trial court suspended Assaye's driver's license for thirty days, fifteen of which were for an "absolute" suspension, and during the other fifteen days, Assaye was permitted to "drive to or from work or to or from school."

On March 27, 2008, Assaye filed a timely notice of appeal.

## B. Appeal Before the ICA

On appeal before the ICA, Assaye asserted the following points of error: (1) the trial court "erred in receiving the evidence of the laser speed gun reading because the [prosecution] failed to establish the requisite foundation, i.e., the proven accuracy of the particular laser gun used," and (2) the trial court "violated [Assaye's] constitutional privilege

against self-incrimination by imposing a fine in the amount of $650 based solely on [Assaye's] refusal to admit guilt to the excessive speeding charge."

On January 13, 2009, the ICA filed a summary disposition order affirming the trial court's February 27, 2008 judgment, but "remand[ing] this case to the [trial] court for resentencing before a different judge." *State v. Assaye*, No. 29078, 119 Hawai'i 467, 2009 WL 81871 (App. January 13, 2009) (SDO). Therein the ICA held: (1) the trial court "did not err in admitting the laser gun reading," and (2) the trial court "erred in sentencing Assaye because the record reflects that the [trial] court improperly penalized Assaye for his refusal to admit guilt and take responsibility for his conduct." *Id.* at 2.

On January 29, 2009, the ICA filed its Judgment on Appeal. On April 17, 2009, Assaye filed a timely application for writ of certiorari.

## II. STANDARD OF REVIEW

■ "When a question arises regarding the necessary foundation for the introduction of evidence, '[t]he determination of whether proper foundation has been established lies within the discretion of the trial court[,] and its determination will not be overturned absent a showing of clear abuse.'" *State v. Loa*, 83 Hawai'i 335, 348, 926 P.2d 1258, 1271 (1996) (quoting *State v. Joseph*, 77 Hawai'i 235, 239, 883 P.2d 657, 661 (App.1994)) (brackets in original).

## III. DISCUSSION

**A. Pursuant To *Manewa*, Proof That the Laser Gun Was Tested According To Manufacturer Recommended Procedures Is Required To Establish a Sufficient Foundation For the Speed Reading Given By the Same Laser Gun.**

Assaye asserts that the ICA gravely erred in affirming the trial court's decision to admit Officer Franks' laser gun reading into evi-

dence because the prosecution allegedly failed to establish an adequate foundation for the proffered evidence. More specifically, Assaye asserts that the prosecution "failed to adduce evidence as to any manufacturer-recommended testing procedures." Consequently, he asserts that the prosecution "could not prove that the [laser gun] had been tested according to accepted procedures and to be functioning properly."

In *State v. Tailo*, 70 Haw. 580, 582, 779 P.2d 11, 12 (1989), the defendant asserted that the prosecution "failed to prove that the K–15 [radar] gun accurately determined the speed of his vehicle [inasmuch as] no evidence was introduced as to the accuracy of the tuning fork used to test the radar gun." (Brackets added.) This court said:

Because of the strength of the scientific principles on which the radar gun is based, every recent court which has dealt with the question has taken judicial notice of the scientific reliability of radar speedmeters as recorders of speed. *See State v. Gerdes*, 291 Minn. 353, 191 N.W.2d 428 (1971); *People v. MacLaird*, 264 Cal. App.2d 972, 71 Cal.Rptr. 191 (1968); *State v. Tomanelli*, 153 Conn. 365, 216 A.2d 625 (1966); and Annotation, *Proof, by Radar or Other Mechanical or Electronic Devices, of Violation of Speed Regulations*, 47 A.L.R.3d 822, 831–35 (1973). These courts have also consistently held that evidence of the accuracy of the particular radar unit is necessary to sustain a conviction for speeding obtained solely by radar. *State v. Primm*, 4 Kan.App.2d 314, 606 P.2d 112 (1980); Annotation, *Proof, by Radar or Other Mechanical or Electronic Devices, of Violation of Speed Regulations*, 47 A.L.R.2d [3d] 822, 837–39 (1973). "The accuracy of a particular radar unit can be established by showing that the operator tested the device in accordance with *accepted procedures* to determine that the unit was functioning properly and that the operator was qualified by training and experience to operate the unit." *State v. Spence*, 418 So.2d 583, 588 (La.1982); *Gerdes, supra; Primm, supra.*

*Id.* (emphasis added).

In *Tailo*, it was adduced through a police officer's testimony at trial that both an "in-

ternal" and "external" calibration test was performed on the K–15 radar gun, with the latter test requiring the use of a "tuning fork."[3] *Id.* at 581, 779 P.2d at 12. To the extent that this court addressed the issue of what constitutes an "accepted procedure[,]" this court simply observed that other "[c]ourts have found both methods[,]" which included the use of a "tuning fork," "to be acceptable means of proving radar accuracy[,]" and then explained the mechanics of the "tuning fork" test.[4] *Id.* After observing a "split" among the "few courts" that have considered whether "the tuning fork used to test a radar device must itself be proven accurate[,]" this court held:

> We are of the opinion that those cases holding that the [prosecution] is not required to prove the accuracy of the tuning fork are of the better view. It is a daily occurrence in our district courts for police officers to rely upon the accuracy of testing devices used to vouch for the accuracy of their radar guns. Requiring proof of the accuracy of those testing devices in every case would impose an inordinate burden upon the [prosecution] and a great waste of judicial time. Accordingly, we hold that once the [prosecution] puts in evidence that the police conducted a tuning fork test indicating the K–15 gun was properly calibrated, this evidence creates a prima facie presumption that the tuning fork itself was accurately calibrated.

*Id.* at 583, 779 P.2d at 14 (brackets added).

In *Stoa*, the ICA extended *Tailo's* analysis regarding the accuracy of a radar gun to that

of a laser gun. 112 Hawai'i at 265, 145 P.3d at 808. Therein, the defendant asserted that "[n]o Appellate Court in Hawai'i has recognized widespread acceptance of the reliability or accuracy of laser technology as a means of measuring speed."[5] *Id.* at 263, 145 P.3d at 806. The defendant noted that "other jurisdictions have held that the technique of using laser-based devices to measure vehicle speed has not reached the scientific stage of verifiable certainty so as to allow evidence from such devices to be admissible without expert testimony." *Id.*

Assaye correctly points out that the defendant's argument in *Stoa* focused largely on addressing the scientific reliability of laser technology to measure a vehicle's speed. *See id.* However, the ICA apparently decided to address the broader issue of whether a sound factual foundation was laid when it relied on the entire legal framework expressed by this court's opinion in *Tailo*, which was characterized by the ICA in the following manner:

> In concluding that the reading from a radar gun was admissible as prima facie evidence of speed, the supreme court thus relied on three factors: (1) the well-established scientific principles upon which the radar gun was premised; (2) the fact that other courts had taken judicial notice of the scientific reliability of radar guns as recorders of speed; and (3) the proven accuracy of the particular radar gun used, established by evidence that (a) the device was tested according to accepted procedures and was determined to be functioning properly, and (b) the operator of the device was qualified by training and experience to operate the device.

3. In *Tailo*, the police officer testified at trial that "prior to clocking Appellant's vehicle, he 'took a tuning fork ... stamped 50 (fifty) MPH at the factory, ... tapped it ... [and] held it in front of the [K–15] unit and got a reading of five zero ... [which] indicated that the unit was functioning properly.'" 70 Haw. at 583, 779 P.2d at 14 (ellipses and brackets in original).

4. This court explained:

> A special tuning fork can be used to check the calibration of the radar gun. The tuning fork is specially tuned to vibrate at a frequency equal to the Doppler frequency for some set speed stamped into the handle of the fork. To

test the accuracy of the radar gun with the fork, the officer strikes the fork to get it vibrating and then holds the fork in front of the radar head. The radar unit will then read the fork's vibration and display the read Doppler frequency value for comparison by the officer with the imprinted value on the fork.

*Tailo*, 70 Haw. at 581, 779 P.2d at 12.

5. We note that the police officer that cited the defendant for speeding in *Stoa* appears to have used the same laser gun as Officer Franks in this case. *See* 112 Hawai'i at 261, 145 P.3d at 804 (stating the Sergeant Yamada was "[e]quipped with an LTI 20–20 laser gun").

*See id.* at 264–68, 145 P.3d at 807–11 (interpreting *Tailo*, 70 Haw. at 582, 779 P.2d at 13). Through this framework, the ICA held not only that they would "take[ ] judicial notice of the scientific acceptance of the accuracy and reliability of laser speed-measuring devices[,]" but also that "the prosecution presented evidence sufficient to establish that the *particular* laser device used by Sergeant Yamada was functioning properly and that Sergeant Yamada was qualified by training and experience to operate the device." *Id.* at 268, 145 P.3d at 811 (emphasis added).

In support of its latter holding, the ICA reasoned:

> Sergeant Yamada testified that he performed the required functionality tests on the laser gun prior to beginning his patrol, and that the readings indicated that the device was functioning properly. He also testified that he possessed a valid certification for operating the laser gun and that he had twenty years' experience in performing traffic enforcement duties.

*Id.*

Similarly, in this case, Officer Franks testified that he conducted four tests prior to his shift in order to determine whether the laser gun he was going to use on September 5, 2007 was "functional and working properly." These tests included the "self-test," the "display test," the "scope alignment test," and the "delta distance test."[6] Officer Franks testified further that he was certified to use the laser gun on September 5, 2007, that he was "instructed in the testing and operating of the device" through a four-hour class that was taught by another police officer who was also "certified," and that he has never "had any problems" with the laser gun since he was assigned to the "motorcycle detail" in the past "year and three months."

▪ In light of the foregoing, simply applying *Stoa's* reasoning and holding to this

case would result in the conclusion that the four tests conducted by Officer Franks were in fact "accepted procedures to determine [whether] the [laser gun] was functioning properly" on September 5, 2007. *See id.* at 265, 145 P.3d at 808. However, we hold that the ICA's decision in this case, and by implication its decision in *Stoa*, is obviously inconsistent with this court's decision in *Manewa* insofar as *Manewa* requires the prosecution to prove that the four tests conducted by Officer Franks were procedures recommended by the manufacturer for the purpose of showing that the particular laser gun was in fact operating properly on September 5, 2007.

In *Manewa*, an expert who was qualified in the field of drug analysis and identification testified that he routinely weighed every piece of evidence that came in as part of his responsibility in analyzing and identifying illegal drugs. 115 Hawai'i at 346, 354 & n. 10, 167 P.3d at 339, 347 & n. 10. This expert testified that he used an "analytical balance" to determine the weight of the substances he was measuring, and a "gas chromatograph mass spectrometer" ("GCMS") to confirm either the presence or absence of methamphetamine in the same substance. *Id.* at 346–48, 167 P.3d at 339–41.

Ultimately, pursuant to *Wallace*, this court distinguished between an expert's admissible testimony based on personal knowledge on the one hand, and on the other hand, an expert's assumption regarding the correct calibration of his measuring device, which this court held constitutes inadmissible hearsay. *Id.* at 353–54, 167 P.3d at 346–47. With regard to the GCMS, this court placed particular emphasis on the record in the case, which "indicate[d] that there was an established manufacturer's procedure that could be conducted by the user to ensure that the GCMSs were in working order according to the manufacturer's specifications." *Id.* at 354, 167 P.3d at 347 (brackets added).

---

6. These four tests appear to be the same tests conducted by Sergeant Yamada in *Stoa*. *See* 112 Hawai'i at 262, 145 P.3d at 805 (referring to the four tests conducted by Sergeant Yamada on his

"LTI 20–20" as the "self-test," the "display test," the "scope alignment test," and the "calibration test").

We continued: "Because the evidence indicated the GCMSs were operating 'within the manufacturer specification(s),' under this procedure [the expert's] own testimony supported the conclusion that the GCMSs were in proper working order at the time the evidence was tested." *Id.* (brackets added). Thus, this court held that the expert's "personal knowledge" that was adduced through his testimony at trial was sufficient "to establish that the GCMSs were in proper working condition." *Id.*

Crucial to this court's holding in *Manewa* was the expert's testimony that "there was an *established manufacturer's procedure* that could be conducted by the user to ensure that the GCMSs were in working order according to the *manufacturer's specifications.*" *Id.* (emphases added). In this case, the record is silent as to any manufacturer recommended procedure that could be used to determine the accuracy of the laser gun on September 5, 2007.

The prosecution asserted in its answering brief that Officer Franks "had calibrated the LTI 20–20 UltraLyte according to established procedure for verifying and validating that it was in proper working order...." Although Officer Franks testified that he was "certified" to use the laser gun on September 5, 2007, and he was "instructed in the testing and operating of the device," the prosecution does not point to anywhere in the record to indicate that the four tests that Officer Franks testified to conducting were recommended procedures by the manufacturer for the purpose of showing that the laser gun was in fact operating properly on September 5, 2007. *See Manewa,* 115 Hawai'i at 354, 167 P.3d at 347. Therefore, concluding that Officer Franks had tested the laser gun according to manufacturer recommended procedures would invite the same kind of assumption that this court expressly rejected as inadmissible hearsay in both *Wallace* and

*Manewa. See id.* at 355, 167 P.3d at 348 (holding that Mohammed's "assumption that the [analytical] balance was accurate was based on inadmissible hearsay" because he "lacked the personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so" (quoting *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725 (internal quotation marks omitted))).

The prosecution also asserted that Officer Franks' testimony indicated that he conducted the same tests that were upheld by the ICA as sufficient to prove that the laser gun was tested according to "accepted procedures," and that "[n]othing" in *Stoa's* "formulation of the factors necessary to lay a proper foundation for the results from a laser speed gun suggests that an operator must be an expert or that a manufacturer's representative must testify or even that certification must be provided." As discussed above, clearly, Officer Franks did in fact conduct the same tests that were upheld by the ICA in *Stoa.* However, as Assaye points out, the ICA's opinion in *Stoa* is unclear on this issue, and we thus overrule *Stoa* insofar as *Stoa* may be read to hold contrary to this court's opinion in *Manewa.*

Moreover, although *Tailo* does not expressly state that the "accepted procedures" for testing the accuracy of a particular laser gun must be adduced through evidence that the procedures are recommended by the manufacturer, it is difficult to discern how a sound factual foundation may be laid here without such evidence.[7] Indeed, other courts have looked to the manufacturer of a laser gun for a similar purpose. *See State v. Ali,* 679 N.W.2d 359, 366–67 (Minn.Ct.App.2004) ("But Officer Johnson also testified that the certification document was created in the regular course of the department's business to ensure that the laser is accurately measuring speed and meeting the 'manufacturer's

---

7. We note that, in *Tailo,* this court observed:

> On cross-examination, the officer testified that the K–15 [radar] gun was calibrated at the factory and that his methods for testing the gun were designed to determine "whether or

not he unit was functioning properly"; "not [to] calibrate the gun" which "has to be done by a technician."

70 Haw. at 581, 779 P.2d at 12 (brackets added and in original).

specifications for the output and detection circuits.' "); *In re Admissibility of Motor Vehicle Speed Readings Produced by the LTI Marksman 20–20 Laser Speed Detection Sys.,* 314 N.J.Super. 233, 714 A.2d 381, 391–92 (1998) (ordering that the "[a]dmissibility of [speed readings produced by the LTI Marksman 20–20 Laser Speed Detection System] shall be subject to" certain rules, which includes the requirement that "[p]re-operational checking procedures recommended by the manufacturer of the laser speed detector shall be shown to have been made in each case"), *aff'd sub nom., State v. Abeskaron,* 326 N.J.Super. 110, 740 A.2d 690 (1999); *City of Shaker Heights v. Coustillac,* 141 Ohio App.3d 349, 750 N.E.2d 1229, 1231–32 (2001) (referring to the "LTI 20–20 operating manual" to determine whether the "trial court erred in accepting the laser reading in spite of officer's failure to conduct two of the three tests to ensure accuracy of the laser unit"); *City of Columbus v. Barton,* 106 Ohio Misc.2d 17, 18, 733 N.E.2d 326, 327 (Ohio Mun.Ct.1994) (concluding that the "LTI 20/20 laser speed detector" "is reliable and accurate as a scientific measure of the speed of a moving object, which can be used by law enforcement personnel to measure vehicle speed, provided that the device is used in accordance with certain procedures delineated by the manufacturer"). These courts are not inconsistent with this court's emphasis on foundational evidence indicating what the manufacturer recommended procedures are. *See Manewa,* 115 Hawai'i at 354, 167 P.3d at 347. Such evidence was not adduced in this case.[8]

In light of the foregoing, we hold that an "inadequate foundation was laid to show that the [speed] measured by the [laser gun]

could 'be relied on as a substantive fact[.]' " *Manewa,* 115 Hawai'i at 356, 167 P.3d at 349 (quoting *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725). Accordingly, we hold that the ICA erred in affirming the trial court's decision that Officer Franks' testimony provided a proper foundation for the speed reading given by the laser gun, and the trial court abused its discretion by concluding as such. *See Loa,* 83 Hawai'i at 348, 926 P.2d at 1271.

**B. Officer Franks' Testimony Is Insufficient To Prove That He Was Qualified By Training and Experience To Operate the Laser Gun.**

■ Assaye asserts that the ICA gravely erred in affirming the trial court's decision to admit the laser gun's speed reading into evidence because Officer Franks' testimony was insufficient to prove that he was qualified by training and experience to operate the laser gun. The prosecution asserted that Officer Franks' "unrebutted testimony that he was instructed and certified to use the LTI 20–20 Ultralyte by Sergeant Ryan Nishibun was sufficient to establish" that he was qualified by training and experience to operate the laser gun.

To reiterate, this court has said that "[t]he accuracy of a particular radar unit can be established by showing that the operator tested the device in accordance with accepted procedures to determine that the unit was functioning properly *and that the operator was qualified by training and experience to operate the unit.*" *Tailo,* 70 Haw. at 582, 779 P.2d at 13 (emphasis added). The ICA extended this court's analysis in *Tailo* to apply to the accuracy of a speed reading given by a particular laser gun. *See Tailo,* 70 Haw. 580, 779 P.2d 11.

---

8. Particularly, we note that, in addition to the above testimony, Officer Franks testified on cross-examination that he had "no idea" "what the manufacturers would do to calibrate the gun." He testified further:

> Q.... Do you know, do you have a maintenance log, the calibration logs (indiscernable) the last time it had ever gone to the manufacturer?
> A. I don't, but our division most likely does.
> Q. Okay. You don't have—

> A. I don't have any, I don't have any in my file or anything like that. They keep that for department records.
> [DEFENSE COUNSEL:] Your Honor, I have no further questions, but I would at this point move to suppress any reading from the LTI 2020 pursuant to [*Manewa*] (indiscernable).
> THE COURT: Alright, for the reasons that you've produced, that motion is denied.
> (Brackets added.)

In *Ito*, the defendant was convicted of committing the offense of driving under the influence of intoxicating liquor ("DUI"). 90 Hawai'i at 230, 978 P.2d at 196. The parties stipulated that the arresting police officer "was trained through the standard course ... at [the Honolulu Police Department ("HPD")]" to administer the horizontal gaze nystagmus ("HGN") test. *Id.* at 243–44, 978 P.2d at 209–10. Consequently, the trial court determined that the arresting officer was "qualified to testify to the results of Defendant's HGN test" based on its "assum[ption] that the standard training from HPD is ... sufficient" to show that the police officer "has in fact been qualified to give the test." *Id.* at 244, 978 P.2d at 210 (brackets and ellipsis added).

However, the ICA held that "no evidence was adduced that [the arresting officer] was duly qualified to conduct the HGN test and grade the test results" because "it is not clear what HPD's 'standard training' consists of and whether HPD's standard training program meets the requirements of the [National Highway Traffic Safety Administration ("NHTSA")]." *Id.* (brackets added). Thus, the ICA "[had] no way of knowing the extent and nature of [the arresting officer's] HGN training, whether [the arresting officer's] training was supervised by certified instructors, whether [the arresting officer] was certified to administer the test, and whether [the arresting officer] received periodic retraining to refresh himself on his HGN test administration skills." *Id.* (brackets added).

Similarly, in *State v. Mitchell*, 94 Hawai'i 388, 391, 15 P.3d 314, 317 (App.2000), the defendant was also convicted of DUI. At trial, the arresting police officer testified that he had been trained to conduct the HGN test through a "DUI class" that he attended, which was taught by another police officer who was a "certified DUI instructor." *Id.* at 397–98, 15 P.3d at 323–24. The ICA held, based on its opinion in *Ito*, that the prosecu-

tion did not adduce sufficient evidence to indicate that the arresting officer was duly qualified to conduct the HGN test for the following reasons:

> The [prosecution] did not ... elicit any testimony as to whether the training Officer Dalere received meets the requirements of the NHTSA. Officer Dalere did not explain the nature and extent of the training except to say that the HGN training is part of the HPD DUI class taught by a certified instructor. Officer Dalere did explain the standardized clues he looks for as indicators of HGN; however, he did not testify that he was certified to administer the HGN test, or that he received periodic retraining to refresh himself on his HGN test administration skills.

*Id.* at 398, 15 P.3d at 324 (brackets and ellipsis added).

■ As discussed above, the prosecution must prove that the laser gun's accuracy was tested according to procedures recommended by the manufacturer. *See Manewa*, 115 Hawai'i at 354, 167 P.3d at 347. Insofar as an officer's training is concerned, we hold that the same burden of proof is applied to the issue of whether the officer is qualified by training and experience to operate the particular laser gun; namely, whether the nature and extent of an officer's training in the operation of a laser gun meets the requirements indicated by the manufacturer.[9] *See Ito*, 90 Hawai'i at 244, 978 P.2d at 210. Therefore, without a showing of the nature and extent of the "certifi[cation]," testimony showing merely that a user is "certified" to operate a laser gun through instruction given by a "certified" instructor is insufficient to prove that the user is qualified by training and experience to operate the laser gun. *See id.*

To reiterate, Officer Franks testified that he was "certified" to use the laser gun on September 5, 2007, that he was "instructed in

9. We note that, in *Tailo*, this court observed simply that "the officer testified that he was formally trained and certified to use the K–15 gun[.]" 70 Haw. at 583, 779 P.2d at 13. How-ever, this observation was made without any further facts or reasoning. Therefore, insofar as *Tailo* may be read to support a conclusion contrary to this case, we clarify *Tailo* accordingly.

the testing and operating of the device" through a four-hour class that was taught by another police officer who was also "certified," and that he has never "had any problems" with the laser gun since he was assigned to the "motorcycle detail" in the past "year and three months." In addition to the testimony quoted *supra*, during cross-examination, Officer Franks testified, as follows:

> Q. . . . And you never got any kind of training program on the mainland or with the manufacturer, just what they offered here in Hawaii, the four-hour class?
>
> A. Yes, the certified instructors from the Laser Technology. They get certified and they instruct us on how to be operators.

Notwithstanding the foregoing testimony, the prosecution has not shown whether the training that Officer Franks received "meets the requirements" of the manufacturer of the laser gun. *See id.* In this regard, Officer Franks "did not explain the nature and extent of the training" he received. *See Mitchell*, 94 Hawai'i at 398, 15 P.3d at 324; *see also Ito*, 90 Hawai'i at 244, 978 P.2d at 210. Therefore, we cannot say that the prosecution satisfied its burden of proving that Officer Franks was "qualified by training and experience to operate the" laser gun. *See Tailo*, 70 Haw. at 582, 779 P.2d at 13.

Inasmuch as the ICA's decision in this case, and by implication its decision in *Stoa*, suggests that Officer Franks' testimony is sufficient to prove that he is in fact "qualified by training and experience to operate the" laser gun, we overrule *Stoa* insofar as it is contrary to our holding that the ICA's decision is obviously inconsistent with its decision in *Ito*. Accordingly, we hold that the trial court abused its discretion by concluding that Officer Franks' testimony provided a proper foundation for the speed reading given by the laser gun. *See Loa*, 83 Hawai'i at 348, 926 P.2d at 1271.

## C. Assaye's Conviction Must Be Reversed Because the Prosecution Did Not Adduce Sufficient Evidence To Prove Every Element Of the Offense Charged Beyond a Reasonable Doubt.

As this court observed: "HRS § 701–114(1)(a) and (b) (1993) requires proof be-

yond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense." *Manewa*, 115 Hawai'i at 357–58, 167 P.3d at 350–51 (quoting *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725).

For the offense of excessive speeding, the prosecution must prove beyond a reasonable doubt that the defendant "[drove] a motor vehicle at a speed exceeding: (1) The applicable state or county speed limit by thirty miles per hour or more; or (2) [e]ighty miles per hour or more irrespective of the applicable state or county speed limit." HRS § 291C–105(a) (brackets added).

As discussed *supra* in sections III.A and III.B, we hold that the prosecution did not provide a sufficient foundation for the admission of Officer Franks' testimony regarding the speed reading given by his laser gun. No other evidence was admitted at trial indicating the speed that Assaye was driving his motor vehicle. Therefore, disregarding Officer Franks' testimony as to the speed reading given by the laser gun results in a record that is "devoid of any evidence" of the speed that Assaye was driving his motor vehicle, which is obviously a material element of the offense charged. *See Manewa*, 115 Hawai'i at 358, 167 P.3d at 351; *see also* HRS § 291C–105(a). Inasmuch as this material element is not supported by "substantial and admissible evidence," the prosecution has not adduced "sufficient evidence to prove every element of the offense[ ] beyond a reasonable doubt." *See Manewa*, 115 Hawai'i at 358, 167 P.3d at 351. Therefore, we hold that Assaye's conviction must be reversed.

## IV. CONCLUSION

Based upon the foregoing analysis, we reverse the trial court's February 27, 2008 judgment.

Concurring Opinion by ACOBA, J.

I concur with the conclusion of the majority that *State v. Manewa*, 115 Hawai'i 343, 167 P.3d 336 (2007), "requires [Respondent-

Plaintiff–Appellee State of Hawai'i (Respondent) ] to prove that the four tests conducted by [Officer Jeremy Franks (Officer Franks) ] were procedures recommended by the manufacturer for the purpose of showing that the particular laser gun was in fact operating properly on September 5, 2007." Majority opinion at 212, 216 P.3d at 1235. However, *Manewa* imposes the additional requirement that Respondent show "that the [laser gun] had been properly calibrated by the manufacturer's service representatives[.]" *See Manewa*, 115 Hawai'i at 354, 167 P.3d at 347.

In *Manewa*, the defendant challenged two instruments used to obtain information about the crystalline substance at issue in that case. In regard to the instrument used to ascertain the identity of the substance, known as the "GCMS," "an expert in drug analysis and identification," *id.*, testified that a manufacturer's representative "c[a]me in if not twice, at least once a year," "to service and calibrate" the GCMS, *id.* at 349, 167 P.3d at 342. Additionally, the expert testified that each morning, "a routine check" was conducted on the GCMS "to ensure that all the parameters are within the manufacturer's specifications." *Id.* at 354, 167 P.3d at 347. On this basis, this court held that "a proper foundation for the identity of the crystalline substances was laid." *Id.*

On the other hand, in regard to the instrument used to weigh the crystalline substance, known as the "balance," the expert "was not qualified as an expert in the calibration of the [ ] balance." *Id.* Although the expert testified that the balance was serviced semi-annually, "there was no evidence that [he] had personal knowledge that the balance had been correctly calibrated." *Id.* at 355, 167 P.3d at 348. In contrast to the evidence regarding the GCMS, there was no evidence "that there was an accepted manufacturer's established procedure for 'verifying and validating' that the balance was in proper working order[.]" *Id.* at 354, 167 P.3d at 347 (brackets omitted). *Manewa* held that no

proper foundation had been laid for the balance, in part because there was no evidence "that the balance had been properly calibrated by the manufacturer's service representatives[.]" *Id.* Thus, *Manewa* requires not only that Respondent show that there is an accepted manufacturer's procedure for ensuring that the instrument is in proper working order, but also that it show that the instrument has been inspected and serviced as required by the manufacturer.

In this case, at oral argument, Respondent was asked whether the laser gun used by Officer Franks "ha[d] to be maintained and inspected periodically[.]" MP3: Oral Argument, Hawai'i Supreme Court, at 26:03 (Aug. 10, 2009).[1] Respondent replied that "[i]t's not part of the record, I believe they are, once a year, and I believe there's a record log kept somewhere but I don't believe that's come out in any of these cases." *Id.* at 26:10.

During rebuttal, counsel for Petitioner–Defendant–Appellant Abiye Assaye (Petitioner) stated, in connection with the foregoing, that the Honolulu Police Department (HPD) maintained a record of servicing the laser guns annually, that "Officer Franks did admit that he believed or suspected that HPD kept those records although he himself did not have any of the records, he didn't maintain them personally, nor did he bring them to court for trial on that day." *Id.* at 37:05. As to whether the laser gun was ever serviced during the fifteen months that it was in Officer Franks's possession, Petitioner's counsel stated on rebuttal as follows:

> There is evidence the gun was used when it was assigned to Officer Franks. *Again in the 15 months he had the gun the gun was never sent in for any type of maintenance or servicing by Laser Technologies or any other regulatory agency.* During those 15 months, Officer Franks would use the gun he said five days a week and he kept the gun in the saddle bag of his motorcycle whether he was on or off duty.

MP3: Oral Argument, at 38:25 (emphasis added).

---

1. This oral argument is available at http://www. courts.state.hi.us/page_server/Courts/Oral Argu- ments/ArchivePages /6E3FCA4550D3D 36C11C25E500A1.html.

Petitioner's counsel's rebuttal remarks are supported by the testimony Officer Franks gave at trial. Officer Franks testified, "I haven't in my one year three months, I've never turned [the laser gun] in for service." Officer Franks also stated that the tests he performed prior to his shifts were "about it [sic] that I was instructed to do by the instructors. That's all I have to know that it's operating."

In sum, Respondent indicated that it "believed" that laser guns of the type used by Officer Franks had to be maintained and inspected periodically "once a year." However, Officer Franks testified that during the fifteen months he had had the laser gun, he had never turned it in for service. As foundation for admission of the laser gun reading, Respondent did not show that the laser gun had been inspected and serviced in the manner directed by the manufacturer.